## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **COLLEEN A. BREMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:22-cv-00272-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Kilolo Kijakazi,* | ) | |
| ***Acting Commissioner of the Social*** | ) | |
| ***Security Administration,*** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Colleen A. Bremer appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (ECF 1). For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I. FACTUAL AND PROCEDURAL HISTORY

Bremer applied for DIB in March 2020, alleging disability as of November 27, 2015. (ECF

14 Administrative Record ("AR") at 273-77).[1] She was last insured for DIB on December 31,

2021 (AR 23),[2] and thus, she must establish that she was disabled by that date. *See Stevenson v.

Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she

was disabled by her date last insured in order to recover DIB). Bremer's claim was denied

---

[1] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

[2] There is conflicting evidence of record as to Bremer's date last insured. The ALJ's decision reflects that Bremer was last insured for DIB on December 31, 2021 (AR 23), but several other documents of record indicate that she was last insured for DIB on December 31, 2020 (AR 298, 353). This discrepancy, however, is immaterial to the outcome of this Opinion and Order.

initially and upon reconsideration. (AR 154-55). On August 12, 2021, administrative law judge ("ALJ") Terry Miller conducted an administrative hearing (AR 44-104), and on September 28, 2021, rendered an unfavorable decision to Bremer, concluding that she was not disabled because, despite the limitations caused by her impairments, she could perform a significant number of jobs in the national economy (AR 21-36). The Appeals Council denied Bremer's request for review (AR 7-14), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Bremer filed a complaint with this Court on August 17, 2022, seeking relief from the Commissioner's decision. (ECF 1). Bremer argues in this appeal that the ALJ: (1) erred by "cherry picking" the record and "playing doctor" when interpreting the evidence and determining the residual functional capacity ("RFC"); and (2) erred when evaluating her work history. (ECF 23 at 7).

On the date of the ALJ's decision, Bremer was forty-four years old (AR 273); was a high school graduate and had attended some college (AR 55-56, 371); and had past relevant work as a fast food worker, library worker, packager, clown or entertainer, and night auditor (AR 34, 97). In her application, Bremer alleged disability due to: a fractured pelvis and vertebrae after being struck by a truck while riding a moped in August 2015; a severe head injury and brain trauma seizures; problems with her left eye peripheral vision; left-sided weakness and left hand pain; nerve damage in her back and hip and severe back pain; post traumatic stress disorder (PTSD), anxiety, depression, and daily panic attacks; sensitivity to sounds, lights, and smells; severe long and short term memory loss; severe cognitive issues; and being easily agitated. (AR 370, 462).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation and quotation marks omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## III. ANALYSIS

### A. The Law

Under the Act, a claimant seeking DIB must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less

than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4) whether she is incapable of performing her past relevant work, and (5) whether she is incapable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520.[3] "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The Commissioner's Final Decision

At step one of the five-step analysis, the ALJ found that Bremer had engaged in substantial gainful activity ("SGA") in 2018, that is, after her alleged onset date of November 27, 2015, and thus, she was not disabled during 2018. (AR 23-24). The ALJ further found that while Bremer

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks she can do despite her limitations. 20 C.F.R §§ 404.1520(a)(4), 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. *Id.* § 404.1520(e).

worked part-time in 2016, 2017, 2019, and 2020, such work did not rise to the level of SGA, and

thus, he proceeded on to step two. (AR 24). There the ALJ found that Bremer had the following

severe impairments: residuals from a motor vehicle accident in 2015, including traumatic brain

injury/skull fracture, vertebral fractures of the thoracic and lumbar spine/multiple pelvic

fractures, and left-hand fractures with some residual left-hand deformities of the fingers, with

other residual conditions of dizziness, left visual field cut, and headaches; history of seizures;

polyneuropathy; mood disorder, depression; anxiety/panic disorder; PTSD; history of attention

deficit hyperactivity disorder; and history of alcohol and drug usage, including cannabis and

methamphetamine. (*Id.*)

At step three, the ALJ concluded that Bremer did not have an impairment or combination of

impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix

1. (*Id.*). The ALJ then assigned Bremer the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR
> 404.1567(b) except only occasional climbing of ramps and stairs, balancing,
> stooping, kneeling, crouching, crawling; never climbing ladders, ropes, scaffolds.
> Only occasional reaching overhead with the non-dominant left upper extremity;
> frequent reaching in front or to the side of the body, handling and fingering with
> the non-dominant left upper extremity. She has no peripheral vision on the left
> side. She needs to avoid concentrated exposure to wetness, loud noise,
> bright/flashing lights; and needs to avoid all exposure to hazards, including
> operational control of dangerous moving machinery, unprotected heights,
> slippery/uneven/moving surfaces, and use of moving vehicles. The claimant is
> limited to understanding, carrying out, and remembering simple instructions,
> consistent with unskilled work (defined as occupations that can be fully learned
> within a short period of time of no more than 30 days, and requires little or no
> judgment to perform simple tasks), with the ability to sustain those tasks
> throughout the 8-hour workday without frequent redirection to task. The ability to
> use judgment in making work-related decisions is limited to making only simple
> work-related decisions. She should not work in an environment that is stringently
> production or quota based, and thus may not perform fast paced assembly-line
> type of work, but can meet production requirements that allow her to sustain a
> flexible and goal-oriented pace. She is able to deal with changes in a routine work
> setting. She can have only superficial interactions with supervisors, coworkers,

and the general public, defined as occasional and casual contact with no
prolonged conversations.

(AR 28).

The ALJ determined at step four that given the foregoing RFC, Bremer could not perform

any of her past relevant work. (AR 34). At step five, however, the ALJ found that Bremer could

perform a significant number of unskilled, light-exertional jobs in the economy, including

marker, cleaner, and small products assembler. (AR 35). Therefore, Bremer's application for

DIB was denied. (AR 35-36).

*C. The RFC*

Bremer argues that the ALJ erred when assigning the RFC by "playing doctor" and "cherry-

picking" various evidence of record, including the opinion of Leslie Predina, Ph.D., H.S.P.P., an

examining psychologist. (ECF 23 at 9-20; *see* AR 1243-48). The Court will consider these

arguments in turn.

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in

an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five

days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (bold emphasis omitted). That

is, the "RFC does not represent the *least* an individual can do despite his or her limitations or

restrictions, but the *most*." *Id.* (footnote omitted); *see also Young v. Barnhart*, 362 F.3d 995,

1000-01 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the
> case record, including medical evidence and relevant nonmedical evidence, such
> as observations of lay witnesses of an individual's apparent symptomatology, an
> individual's own statement of what he or she is able or unable to do, and many
> other factors that could help the adjudicator determine the most reasonable
> findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545(a)(3).

6

When determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. 20 C.F.R. § 404.1545(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). "The ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted); *see also John B. v. Saul*, No. 2:18-cv-00223-JVB-JEM, 2019 WL 4233744, at *2 (N.D. Ind. Sept. 5, 2019).

1. Playing Doctor

Bremer argues that the ALJ impermissibly "played doctor" by stating multiple times that her seizures were "generally controlled" when she was compliant with taking Keppra, her anti-seizure medication. (ECF 23 at 10-12 (citing AR 32)). Taking the ALJ's decision in context, he reasoned:

> The undersigned finds the claimant's allegations are not fully consistent with the objective evidence. The claimant has received various forms of treatment, and has been prescribed and has taken appropriate medications, for the alleged impairments, which weighs in her favor; however, the medical records reveal that the medications and treatment have been relatively effective in controlling the claimant's symptoms. . . . [T]he claimant's seizures are generally controlled when she is compliant with taking Keppra. This suggests the claimant is not as limited as alleged.
>
> The claimant has been non-compliant in taking prescribed medications and generally following treatment recommendations. She had a seizure in February 2019, due in part to her having missed "at least one dose" of her Keppra. The claimant endorsed "missing doses of her Keppra." In March 2020, the claimant admitted to "frequently missing" her doses of Keppra, and using recreational drugs and alcohol. Again in June 2020, the claimant experienced a seizure after missing her morning dose of Keppra and drinking alcohol "all night long." The claimant stated she understood she was not supposed to drink alcohol while on medication, but that she drinks anyway. . . . This demonstrates a possible unwillingness to do that which is necessary to improve her condition. It may also be an indication that the claimant's symptoms are not as severe as purported. As noted above, the claimant's symptoms have generally been controlled when she is

compliant with treatment and medications.

(AR 32 (citations omitted)).

Bremer asserts that the ALJ played doctor because no medical provider of record opined that her seizures were "generally controlled" when consistently taking Keppra. (ECF 23 at 10). To the contrary, she asserts that there is evidence her seizures were *not* well-controlled even when consistently taking Keppra. (*Id.*). In support, Bremer cites to an emergency room visit following a seizure in March 2021 where the doctor wrote that Bremer "has been compliant on her anti-epileptic meds," though she concedes this note also includes her boyfriend's statement that she had missed two doses of Keppra in the prior three weeks. (*See* AR 1327). Bremer additionally points to a June 2021 emergency room visit following a seizure where there was no indication of medication noncompliance. (AR 3146-50).

The Commissioner, in response, emphasizes that Bremer visited the emergency room for seizure activity in February 2019, March 2020, June 2020, March 2021, and June 2021, and that at all but one of these visits, the treatment notes reflect that Bremer had recently been noncompliant with her Keppra, at least to some extent. (ECF 29 at 3; *see* AR 1109-10, 1141-46, 1164, 1327-30, 3146-50). Based on this evidence, the Commissioner contends that the ALJ reasonably concluded Bremer's having just one seizure while compliant with Keppra during a three-year period, supports the ALJ's conclusion that her seizures were "generally controlled" when consistently taking her medications as prescribed. (ECF 29 at 5-6 (citing AR 32)).

The Commissioner's argument is reasonable, and furthermore, consistent with a February 2019 emergency room provider's note stating that Bremer had a "[f]airly *well controlled* seizure history, but does have an average of several seizures a year." (AR 1108 (emphasis added)). The Commissioner further points out that the ALJ relied on the opinions of the reviewing state

8

agency doctors when concluding that her seizures were "generally controlled" on medications such that she could perform full-time work. (ECF 29 at 5).

Indeed, Ann Lovko, Ph.D., and William Shipley, Ph.D., state agency psychologists, reviewed Bremer's record in November 2020 and January 2021, respectively, including the evidence that Bremer at times missed medications, yet still concluded that she was not disabled in that "with abstinence from substances" she was able to "understand, carry out and remember simple instructions; . . . make judgments commensurate with functions of simple, repetitive tasks; . . . respond appropriately to brief supervision and interactions with coworkers and work situations; [and] . . . deal with changes in a routine work setting." (AR 150, 162). The Social Security Administration has articulated that these mental activities on a sustained basis are generally required to perform unskilled work. *See Warner v. Astrue*, 880 F. Supp. 2d 935, 942 (N.D. Ind. 2012).[4] The ALJ found Dr. Lovko's and Dr. Shipley's opinions "persuasive" and "[t]heir findings . . . supported and generally consistent with the record." (AR 33); *see Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022) ("[T]he ALJ was permitted to afford great weight to [the reviewing state agency physician's] opinion as a consulting physician, particularly because the ALJ determined that his opinion was consistent with the objective medical evidence." (citations omitted)).

And while Bremer cites to one treatment provider's note from December 2020 that recommended she "avoid driving due to poor control of seizures" (AR 1896), she fails to acknowledge that this provider also noted Bremer's noncompliance with Keppra at times, her regular consumption of alcohol against medical advice, and her history of illicit drug use (AR

---

[4] *See* Social Security Administration Program Operations Manual System (POMS) DI 25020.010, https://secure.ssa.gov/poms.nsf/lnx/0425020010.

1894). As such, this single note does little to undercut the ALJ's conclusion that Bremer's seizures were "generally controlled" when taking her anti-seizure medication as prescribed—that is, when consistently taking Keppra and abstaining from use of alcohol and illicit drugs.

Bremer also contends that the ALJ played doctor when he stated that she had a seizure in February 2019 "due in part to her having missed at least one dose of her Keppra." (ECF 23 at 11 (quotation marks omitted) (citing AR 32)). Indeed, the provider did not specifically state that Bremer's seizure was caused by her missing one dose of Keppra. (*See* AR 1108-09). However, in the narrative summary at the end of the note, the provider wrote: "[Patient] endorses missing dose[] or doses of her Keppra. . . . Patient has seizure medication at home [and] just simply forgot to take dose or doses. The vital signs are improving. Patient feels better." (AR 1109). Therefore, the ALJ's summary of the February 2019 provider note is not without some basis in the record and does not rise to a reversible error. *See Warrior v. Kijakazi*, 583 F. Supp. 3d 1191, 1204 (E.D. Wis. 2022) ("[The Court's] role is limited; [it] must evaluate whether substantial evidence supports the ALJ's assessment and affirm if it does, even if some of the ALJ's findings are 'a bit harsh.'" (citing *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008)).

Finally, Bremer argues that the ALJ erred by commenting that her medication noncompliance "demonstrates a possible unwillingness to do that which is necessary to improve her condition," and may also be an "indication that [her] symptoms are not as severe as purported." (ECF 23 at 11 (citing AR 32)). Bremer contends that the ALJ failed to consider that her medication noncompliance could have been caused by her memory problems. (*Id.* (citing AR 1247, 1263, 1909)). But the ALJ *did* consider Bremer's memory problems, concluding they were "moderate" and thus not as severe as Bremer claimed. (AR 26-27, 31). The ALJ then accounted for Bremer's mental limitations in the RFC by limiting her to unskilled work and imposing other

mental parameters. (*See* AR 28, 31). Further, the ALJ considered that Bremer performed disqualifying SGA in 2018 (three years after her 2015 accident) despite her memory impairments,[5] and concluded that "[t]here is nothing in the record which indicates [her] conditions have progressively worsened since that time." (AR 32). Consequently, Bremer's argument that the ALJ committed reversible error by "playing doctor" does not necessitate a remand of the ALJ's decision.

### 2. Cherry-Picking the Record

Next Bremer argues that the ALJ cherry-picked the record about her gait problems, seizures, memory deficits, upper extremity problems, mental limitations, and her boyfriend's support when determining that she had the ability to perform full-time work. (ECF 23 at 12-18). Because Bremer's cherry-picking arguments about her seizures, memory deficits, and mental limitations overlap with other arguments discussed elsewhere in this Opinion and Order, the Court will focus here on Bremer's arguments pertaining to her gait problems, her boyfriend's support, and her upper extremity deficits.

#### a. Gait Problems

Bremer contends that the ALJ cherry-picked her physical therapy discharge note from April 2021 when writing:

> [T]he medical records reveal that the medications and treatment have been relatively effective in controlling the claimant's symptoms. The claimant saw "nice improvement" in gross strength over the course of occupational therapy. She showed "good progress." Overall her balance and lower extremity strength ha[ve] "really gotten better." She felt pretty confident doing "many things" on her own. Therapy has been helpful. . . . This suggests the claimant is not as limited as alleged.

---

[5] Bremer argues that her work in 2018 was not disqualifying SGA, but for the reasons discussed *infra*, that argument is unpersuasive.

(ECF 23 at 12 (citing AR 32)). Bremer points out that the physical therapy discharge note also indicated that she "ambulates with gait deviation with decreased stance time and control on left," and was "[u]nable to maintain a normal gait on a variety of surfaces." (*Id.* (citing AR 1309-10)). She then cites her physical therapy records from 2017 that documented a "moderate limitation" in walking and "severe limitations" in standing and sit-to-stand (AR 1289), a 2017 emergency room note stating that her "gait is impaired" (AR 2343), and an April 2021 note from her primary care physician that mentioned she had "unsteady gait [with] turns" (AR 1308). She also points to a February 2019 emergency room note after she had experienced a seizure in which the provider stated that she "gets assistance from her boyfriend with ambulation." (AR 1108).

The ALJ did not commit reversible error by failing to discuss Bremer's physical therapy records from 2017, given that more recent physical therapy records existed by the date of the ALJ's 2021 decision rendering the 2017 records remote in time. *See Dodson v. Kijakazi*, No. 4:20 CV 625 CDP, 2021 WL 4125038, at *8 (E.D. Mo. Sept. 9, 2021) ("[G]enerally, an ALJ cannot rely on remote evidence to determine a claimant's abilities . . . ." (citation omitted)). Bremer obviously made significant improvements in the years following her 2015 accident, such that she was able to return to work in a medium-exertional job earning SGA in 2018. (*See* AR 32). Both M. Brill, M.D., and J.V. Corcoran, M.D., state agency physicians who reviewed Bremer's records in November 2020 and January 2021, respectively, concluded that Bremer could walk or stand up to six hours in an eight-hour workday. (AR 145, 160).

Nor did the ALJ unfairly summarize the 2021 physical therapy and family practitioner records that mention her gait, given that no provider of record actually assigned her any walking or standing limitations inapposite to the assigned RFC. *See Gedatus v. Saul*, 994 F.3d 893, 904

12

(7th Cir. 2021) ("A fundamental problem is [the claimant] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set." (citation omitted)); *Golembiewski*, 322 F.3d at 917 ("[T]he ALJ need not discuss every piece of evidence in the record, [but] the ALJ may not ignore an entire line of evidence that is contrary to the ruling." (citations omitted)). Further, as will be discussed *infra*, the February 2019 emergency record noting that Bremer "gets assistance from her boyfriend with ambulation" (AR 1108) was written shortly after Bremer had experienced a grand mal seizure, and thus, is an outlier among the plethora of other evidence of record showing that Bremer ambulates independently. As such, the ALJ did not unfairly consider the evidence of record pertaining to Bremer's gait.

### b. Bremer's Boyfriend's Testimony

Bremer next cites her boyfriend's testimony about her various deficits, including her gait problems, and his claim that he provides significant support to her since they began living together in 2019. (ECF 23 at 13-15; *see* AR 53). Bremer argues that her boyfriend's testimony that he provides significant care to her is supported by various provider notes of record that mention her boyfriend's care, and that the ALJ cherry-picked or ignored this evidence in discounting the credibility of her boyfriend's testimony. (ECF 23 at 13-15; *see* AR 1108, 1267, 1278, 1304, 1319, 1327, 3146).

Here, the ALJ considered Bremer's boyfriend's testimony, as well as Bremer's own testimony, but concluded that their statements about the severity of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 29). Indeed, most of the records that Bremer cites simply contain her boyfriend's description to a provider about recent seizures or medication compliance, *not* evidence that he provides significant care to Bremer. (*See* AR 1267, 1278, 1304, 1319, 1327, 3146). Of course, "an ALJ

need not mention every snippet of evidence in the record." *Arnett v. Astrue*, 676 F.3d 586, 592

(7th Cir. 2012) (citations omitted). That Bremer's boyfriend was a good historian, knew of

Bremer's compliance or noncompliance with medications, and went with her to the emergency

room after a seizure does not rise to the level of an entire line of evidence ignored by the ALJ, as

this type of evidence is not particularly relevant, much less contrary, to the assigned RFC. *See id.*

("[The ALJ] may not ignore entire lines of contrary evidence." (collecting cases)).

A few documents of record do suggest that Bremer's boyfriend may have provided her with

more assistance on infrequent occasions, but these few instances appear linked with her recently

having had a grand mal seizure. For example, when Bremer visited the emergency room in

February 2019 shortly after experiencing a seizure, the provider wrote "gets assistance from her

boyfriend with ambulation." (AR 1108); *see also* AR 1278 ("Her [boyfriend] states [Bremer]

was doing much better with all balance and endurance activities at home prior to the seizures.

Since [her seizure on Monday night,] she requires HHA with all activities . . . ."). In that regard,

Bremer's boyfriend testified that Bremer "has severe deficits for two days" after she has a grand

mal seizure, and that "it's about a week until she [is] back[] to normal." (AR 92-93). As such,

these few instances in the record documented shortly following a seizure fall short of

constituting an entire line of evidence contrary to the ALJ's conclusion. *Arnett*, 676 F.3d at 592.

To reiterate, there is a plethora of evidence that Bremer otherwise ambulates independently.

(*See, e.g.*, AR 1124 ("Negative for gait problem . . . ."), 1171 ("Gait: Stable"), 1244 ("Her gait

appeared to be unimpaired."), 1355 ("Negative for . . . difficult walking, and weakness."), 3147

("Negative for . . . gait problem . . . .").

In fact, at the hearing, Bremer testified that she does not use an assistive device for

ambulation; nor did she suggest that her boyfriend helps her ambulate. (AR 54 (stating that she

14

does not use a cane or walker to help her stand or walk), 70 ("I can walk around . . . a block."), 73 (stating that she uses a handrail to go upstairs at home), 83 (stating she had no problems going up and down the aisles when going to the grocery store with her boyfriend)). As the ALJ noted, the record reflects that Bremer is independent with her activities of daily living other than some mild difficulties with cooking. (AR 27, 1255). Indeed, Bremer's boyfriend testified that he works full-time outside of the home, so while they maintain regular telephone contact, she is home alone all day. (AR 88; *see* AR 29).

Further, the ALJ considered that Bremer worked in a medium-exertional job in 2018 that resulted in disqualifying SGA, and there was no evidence of record to suggest that her conditions progressively worsened since 2018. (AR 32, 34, 97). So, in 2018 Bremer was able to work a medium-exertional job that resulted in SGA, before her boyfriend moved in with her in 2019. (*See* AR 53). Given this record, Bremer's contention that the ALJ cherry-picked or improperly discounted a material portion of her boyfriend's testimony does not rise to the level of requiring a remand of the case. *See Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021) ("So long as the ALJ issues a reasoned explanation, [the court] will not overturn an ALJ's credibility determination unless it is patently wrong." (citations and internal quotation marks omitted)); *see generally Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022) (stating that the courts "should not nitpick ALJ decisions in quest of a perfect opinion" (citation and quotation marks omitted)).

### c. Upper Extremity Deficits

Bremer also asserts that the ALJ cherry-picked or overlooked evidence pertaining to her upper extremity difficulties. (ECF 23 at 16-17). She contends that she is not capable of performing "frequent" handling and fingering with her left, non-dominant hand as assigned in the RFC, given that she wears finger braces, drops things frequently, and can only pick up small

objects after doing hand exercises. (*Id.* at 17).

The ALJ considered Bremer's testimony that she has problems dropping things with her left hand. (AR 29). In doing so, he noted several medical evaluations that found normal range of motion, strength, and sensation. (AR 30; *see* AR 1124-25, 1159, 1170-71, 1232, 1234). In particular, he considered the occupational therapy discharge note from April 2021, which reflected "sluggish but accurate" upper extremity coordination, normal range of motion, and normal strength. (AR 30 (citing AR 1255-57)). This evaluation further indicated that Bremer was independent with dressing, eating, toileting, fasteners, grooming, and cooking, though cooking caused her minimal difficulty. (AR 1255). No upper extremity limitations were assigned to Bremer by the occupational therapist in this evaluation. Nor did Dr. Brill or Dr. Corcoran, the reviewing state agency physicians, assign any manipulative limitations in their opinions written in November 2020 and January 2021, respectively. (AR 146, 160).

As such, Bremer has failed to point to credible evidence of upper extremity limitations that the ALJ ignored or overlooked. "The ALJ needed only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible." *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011) (citations omitted). Here, the ALJ credited Bremer's testimony of upper extremity difficulties to some extent, explaining that even though Dr. Brill and Dr. Corcoran did not include upper extremity limitations in their opinions, the ALJ limited Bremer's use of her left non-dominant hand in the RFC "based on her testimony regarding deficits in [that] area[]." (AR 33). Consequently, Bremer's argument asserting that the ALJ erred by cherry-picking or ignoring evidence about her upper extremity

deficits is wholly unsupported.[6]

### 3. Dr. Predina's Opinion

Bremer also argues that the ALJ cherry-picked Dr. Predina's opinion by "failing to consider vital pieces of the opinion" that contradict the assigned RFC. (ECF 23 at 18). Dr. Predina conducted a mental status examination of Bremer in November 2020 at the request of the state agency and also administered the Wechsler Memory Scale – Fourth Edition (WMS-IV). (AR 1243-48). Bremer had a flat affect and an anxious mood. (AR 1245). Her effort appeared to "wax and wane on the assessment tasks" and "[a]t times, her effort appeared to be minimal." (AR 1247). Dr. Predina cautioned that "Bremer's effort on the assessment tasks should be considered in evaluating the validity of her performance on the assessment tasks." (*Id.*). Bremer's judgment, common sense, and orientation appeared slightly impaired. (*Id.*). Her ability to sustain concentration and persistence also appeared impaired, and she "may have some problems being able to concentrate and persist on her job responsibilities." (*Id.*). Her cognition appeared average,

---

[6] Bremer also faults the ALJ for failing to consider that she was described as "underweight" several times in the record, with her weight being as low as 95 pounds with a BMI of 15.3. (ECF 23 at 17; *see* AR 730, 823, 1096, 1914). But Bremer does not suggest what type of limitations were necessary due to her being underweight. In any event, the records she cites are all from 2015 and 2016, and thus were stale by the time of the ALJ's 2021 decision. At the hearing Bremer testified that she weighed 130 pounds. (AR 52).

Additionally, Bremer alleges the ALJ erred by failing to discuss an evaluation by Moira Dammrich, Psy.D., H.S.P.P., in April 2016. (ECF 23 at 17-18; *see* AR 1005-07). Dr. Dammrich opined that Bremer "experiences persisting anxiety and depression and lacks adaptive coping skills to handle her emotional experiences," "has difficulty making decisions and experiences increased irritability and restlessness," and "lacks insight into behavioral patterns that have contributed to increased stress." (AR 1006). Dr. Dammrich diagnosed Bremer with a major depressive disorder, recurrent, moderate severity, and a generalized anxiety disorder. (AR 1007-08). But Bremer fails to show how this evidence would have changed the ALJ's outcome, given that Dr. Dammrich did not assign Bremer any specific mental limitations and that the opinion was remote in time by the date of the ALJ's 2021 decision. As already explained, Dr. Lovko and Dr. Shipley both concluded in November 2020 and January 2021, respectively, that " with abstinence from substances, . . . [Bremer] is able to: understand, carry out and remember simple instructions; . . . make judgments commensurate with functions of simple, repetitive tasks; . . . respond appropriately to brief supervision and interactions with coworkers and work situations; [and] . . . deal with changes in a routine work setting." (AR 150, 162). As such, in failing to mention Dr. Dammrich's opinion, the ALJ did not wrongly "ignore an entire line of evidence that supported a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021) (citation omitted). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)  (collecting cases).

but her cognitive adaptive skills were reported to be less than her estimated cognitive ability.

(*Id.*). Dr. Predina concluded that Bremer "appears to have the cognitive ability to perform

comparable jobs to that which she has performed in the past." (*Id.*).

Bremer's performance on the WMS-IV "suggest[ed] the presence of significant deficits with

regard to her memory functioning." (*Id.*). More particularly, Dr. Predina wrote:

> There was considerable scatter across the indices. Her [i]ndex scores fell within the
> Extremely Low range to the Average range. Mrs. Bremer's weakest index was the
> Visual Working Memory Index. This would functionally limit her in being able to
> hold visual information in her immediate awareness while manipulating it to derive
> an answer. A peculiar artifact of her evaluation is that her Delayed Memory Index
> score was substantially better than her Immediate Memory Index score. This pattern
> is often seen in people who suppress their initial response as it is impossible to recall
> information that you did not encode when you first saw/heard the stimulus material.
> As I have little faith in her scores accurately reflecting her true memory ability due
> to what appeared to be limited effort, and that her Delayed Memory is in the
> Average range, I do not feel I can provide a diagnosis for her memory at this time.
> The results of this evaluation should be considered in conjunction with any medical
> tests, including neuroimaging tests . . . . Her medical records may also provide a
> more consistent history of her memory problems than what she was able to provide
> today. She may have some problems recalling tasks on a job.

(*Id.*). Dr. Predina further surmised that Bremer "will likely struggle to get along with her

supervisors and coworkers due to her mental health issues on a job." (*Id.*). Bremer was

diagnosed with a panic disorder and an alcohol use disorder, not in remission, severe. (*Id.*).

The ALJ discussed Dr. Predina's examination results at three different points in his

decision. The ALJ first referenced Dr. Predina's findings when assessing whether Bremer's

mental impairments met or equaled a listing at step three. (AR 26-27). The ALJ later

summarized Dr. Predina's opinion when discussing the medical evidence of record:

> Leslie Predina, Ph.D, conducted a consultative examination in November 2020. The
> claimant alleged experiencing memory problems "all [her] life," and that her
> memory problems worsened after her [traumatic brain injury]. However, on exam,
> her auditory memory was 97 and delayed memory was 93, which is average. The
> claimant's overall dress and grooming were clean and appropriate. Her speech and

articulation skills were within normal limits. The claimant was alert and oriented. Her affect was flat. She made good eye contact with the examiner. The claimant demonstrated social reciprocity. Her mood suggested feelings of anxiety. Her behavior did not suggest difficulties with hyperactivity. The claimant had no problems recalling information on the mental status exam. She recalled seven digits forwards and five digits backwards. The claimant's performance on the mental status examination indicated some issues with her level of cognitive functioning. The limitations in the above [RFC] for understanding, remembering, and carrying out simple instructions; simple work-related decisions; no fast-paced work; and only superficial interactions sufficiently account for these findings.

(AR 31 (first alteration in original) (citations omitted)). Further, when discussing the medical

source opinions of record, the ALJ explained why he found Dr. Predina's opinion "not

persuasive":

Dr. Predina, the consultative examiner, opined the claimant will likely struggle to get along with her supervisor and coworkers due to her mental health issues. This is not persuasive. The opinion is equivocal, and does not provide specific, definitive limitations on the claimant's ability to interact with others. The opinion is not supported by Dr. Predina's exam, which noted the claimant's speech and articulation skills were within normal limits. The claimant made good eye contact with the examiner. She . . . demonstrated social reciprocity. Her behavior did not suggest difficulties with hyperactivity. The opinion is not consistent with other evidence noting the claimant is cooperative with normal mood, affect, and cognition. Her anxiety is controlled, and the claimant is "doing well overall."

(AR 33 (citations omitted)).

Bremer argues that the ALJ committed error by cherry-picking "only the positive

information [from Dr. Predina's opinion], while failing to consider the negative from this

evaluation." (ECF 23 at 20). However, in making this argument, Bremer cites only to the ALJ's

summary of Dr. Predina's findings in the medical evidence section, ignoring that the ALJ

discussed many of Dr. Predina's findings earlier in the step-three section. (*See* ECF 23 at 18-19).

In that earlier section, the ALJ noted Dr. Predina's findings of impaired concentration and

persistence, extremely low visual working memory, and issues with Bremer's level of cognitive

functioning. (AR 26-27). Therefore, the ALJ did not ignore these findings from Dr. Predina. "[I]t

is proper to read the ALJ's decision as a whole, and . . . would be a needless formality to have
the ALJ repeat substantially similar factual analyses at both steps three and five . . . ." *Rice v.
Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (citation omitted); *see Curvin v. Colvin*, 778
F.3d 645, 650 (7th Cir. 2015) ("This discussion provides the necessary detail to review the ALJ's
step 3 determination in a meaningful way. We do not discount it simply because it appears
elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision
would be redundant." (citations omitted)).

Further, the ALJ's discounting of Dr. Predina's opinion is supported by the opinions of Dr.
Lovko and Dr. Shipley, the reviewing state agency doctors. These two doctors considered Dr.
Predina's view that Bremer's "effort was limited" and that the "pattern of scores suggests
intentional suppressing of responses," as well as "[s]ome problems with concentration." (AR
142, 159). However, as discussed earlier, Dr. Lovko and Dr. Shipley both concluded that "with
abstinence from substances," Bremer was "able to[] understand, carry out and remember simple
instructions; . . . make judgments commensurate with functions of simple, repetitive tasks; . . .
respond appropriately to brief supervision and interactions with coworkers and work situations;
[and] . . . deal with changes in a routine work setting." (AR 150, 162).

To reiterate, the ALJ found Dr. Lovko's and Dr. Shipley's opinions "persuasive," and
"[t]heir findings . . . supported and generally consistent with the record." (AR 33). Thus, when
the ALJ was "presented with conflicting medical opinions," he fulfilled his "duty to resolve that
conflict." *Vrooman v. Kijakazi*, No. 20-2939, 2021 WL 3086196, at *2 (7th Cir. July 21, 2021)
(citation omitted); *see Barrett v. Saul*, 822 F. App'x 493, 497 (7th Cir. 2020) (affirming the
ALJ's decision where the ALJ "credited the opinions of the reviewing consultants who reviewed

these same records but nonetheless concluded that [the claimant] was capable of light work, with limitations"). "Even if reasonable minds could differ on the weight to give the conflicting records, [the Court] will not substitute the ALJ's judgment with [its] own. " *Vrooman*, 2021 WL 3086196, at *2 (citations omitted). Consequently, a remand is not necessary based on the ALJ's consideration of Dr. Predina's opinion.

### D. Work History

Finally, Bremer argues that the ALJ failed to properly consider her work history. (ECF 23 at 20-22). In discussing Bremer's past work, the ALJ stated:

> The claimant was able to consistently engage in [SGA] from January to December 2018, despite having the alleged debilitating impairments. There is nothing in the record which indicates the claimant's conditions have progressively worsened since that time. It would therefore be reasonable to infer that the claimant's conditions would not currently prevent the performance of substantial gainful activity.

> Further, . . . the record reflects consistent work activity in 2016, 2017, 2019, and 2020, after the alleged onset date. Although this work does not constitute disqualifying [SGA], it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

(AR 32-33).

### 1. 2018 Earnings

Bremer first asserts that the ALJ improperly found she "consistently" worked from January to December 2018. (ECF 23 at 21). She points to her testimony that she worked for just six months in 2018 packing outdoor furniture cushions on a full-time basis, which is not "consistently" working from January to December. (*Id.* (citing AR 57)). She urges that, as such, her 2018 earnings were an "unsuccessful work attempt," rather than disqualifying SGA. (*Id.* at 22).

"[E]arnings from an unsuccessful work attempt will not show that [a claimant is] able to do [SGA]." 20 C.F.R. § 404.1574(a)(1). The Commissioner "consider[s] work of 6 months or less to

be an unsuccessful work attempt if [the claimant] stopped working or . . . reduced [her] work and earnings below the [SGA] earnings level because of [her] impairment . . . ." *Id.* § 404.1574(c)(3). On the other hand, the Commissioner does not consider work performed at the SGA level "for more than 6 months to be an unsuccessful work attempt regardless of why it ended or was reduced below the [SGA] earnings level." *Id.* § 404.1574(c)(4). The claimant bears the burden of presenting evidence as to when and why she stopped working. *See Sanders v. Kijakazi*, No. 22-2163, 2023 WL 2985189, at *2 (7th Cir. Apr. 18, 2023).

Here, Bremer fails to carry her burden of presenting evidence as to when and why she stopped working in 2018. Instead, she attempts to shift the burden to the ALJ by arguing he "never asked [her] why she left the 2018 packing job." (ECF 23 at 22). Bremer was represented by counsel at the time of the hearing and thus "is presumed to have made [her] best case before the ALJ . . . ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (citation omitted). Bremer's representative could have elicited testimony in support of an unsuccessful work attempt at the hearing, but did not do so. Consequently, on this record, the ALJ did not err in concluding Bremer's 2018 earnings were disqualifying SGA.

2. 2016, 2017, 2019, and 2020 Earnings

Bremer also argues that the ALJ does not explain what "consistent work activity" is during 2016, 2017, 2019, and 2020. (ECF 23 at 22). Bremer earned $378.98 in 2016; $1,080.26; in 2017; $1,019.35 in 2019; and $18 in 2020. (AR 289). Bremer asserts that "[t]hese totals imply anything but 'consistent work activity.'" (ECF 23 at 22).

Bremer raises a good point, given the low earnings each year. But the ALJ's use of the term "consistent work activity" can also be read as that Bremer engaged in *some* work activity, whether full-time or part-time, *every* year after her alleged onset date in 2015. In any event, the

22

ALJ referenced Bremer's non-SGA earnings after her alleged onset to make the point that her "daily activities have, at least at times, been somewhat greater than [she] has generally reported." (AR 33); *see Berger*, 516 F.3d at 546 ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). As such, the ALJ did not impermissibly equate Bremer's limited work hours in 2016, 2017, 2019, and 2020 with an ability to work full-time. Consequently, the ALJ's discussion of Bremer's work activity after her alleged onset date does not necessitate a remand of the ALJ's decision. The Commissioner's final decision will be affirmed.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED. The Clerk is DIRECTED to enter a judgment in favor of the Commissioner and against Bremer.

SO ORDERED.

Entered this 27th day of September 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge